UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| ERASMO REYES, individually and on behalf of all others similarly situated, § § § | | |
| Plaintiff, § § | | |
| § | CIVIL ACTION NO. V-03-128 | |
| § | | |
| TEXAS EZPAWN, L.P., § § | COLLECTIVE ACTION PURSUANT TO 29 U.S.C. §216(b) | |
| Defendant. § | | |

## Memorandum & Opinion

Pending before the Court is Defendant Texas EZPawn, L.P.'s ("Defendant or EZPawn") Motion for Decertification (Dkt. #161). Upon consideration of the motion, the response, and the applicable law, the Court is of the opinion that the Motion for Decertification should be GRANTED.

## Factual and Procedural Background

Defendant is in the retail pawn and short-term loan business with more than 180 locations across Texas. Customers can receive short-term loans either through a pawn loan or a payday loan. Defendant makes loans secured by any item of value including jewelry, firearms, electronics, televisions, stereos, tools, musical instruments, and other items. Payday loans are short-term unsecured loans that mature on the customer's next pay date, generally seven to thirty-seven days after the loan is made. Defendant also sells the merchandise that customers do not redeem or which customers sell directly to it.

The employees at each retail location include Sales and Lending Representatives ("SLRs"), Senior SLRs, one Assistant Store Manager ("ASM"), and one Store Manager. SLRs are responsible for customer service and processing customer transactions. Senior SLRs perform the same job duties as SLRs and may also open or close the store. Defendant classifies both SLRs and Senior

SLRs as nonexempt employees for purposes of the overtime provisions of the Fair Labor Standards Act ("FLSA"). It classifies ASMs and Store Managers as exempt.

On October 31, 2003, Erasmo Reyes filed suit claiming Defendant misclassified ASMs as exempt employees, thereby improperly denying ASMs overtime pay in violation of the FLSA. 29 U.S.C. § 201 *et seq.* Reyes filed on behalf of all other ASMs similarly situated and sought to proceed as a collective action pursuant to 29 U.S.C. § 216(b). This Court conditionally certified a class by approving the issuance of notices of the pending action to potential "opt-in" plaintiffs that were employed or formerly employed as ASMs by EZPawn from October 31, 2000 to the present (Dkt. #24). After sending out the notices, approximately 82 individuals filed written consents to join the present action. After conducting extensive discovery, Defendant has filed the instant Motion for Decertification contending that the 42 or so remaining Plaintiffs in this action are not similarly situated.[1] Defendant asserts that Plaintiffs' challenge to their exempt status requires a fact-intensive, individualized inquiry, and therefore, that collective action is not appropriate in this case.

**Analysis**

The FLSA requires that employees must receive one and a half times their regular pay for hours worked in excess of forty hours each week. 29 U.S.C. § 207(a)(1). This general mandate, however, does not apply to persons employed in a bona fide executive, administrative or professional capacity. *Id.* § 213(a)(1). Employees alleging that their employer has violated this section may bring a collective action under FLSA. The statute, in relevant part, provides: "[a]n action to recover the liability prescribed in [this Title] may be maintained against any employer in

---

[1] *See* dkt. #185 dismissing opt-in plaintiffs who had withdrawn their consents to be a part of this action or on statute of limitations grounds.

any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees *similarly situated.*" *Id.* § 216(b) (emphasis added). Thus, for an opt-in class to be created under the FLSA, an employee must show he and the employees on whose behalf he is suing are "similarly situated." Plaintiffs need only show that "their positions are similar, not identical" to the positions held by the putative class members. *Grayson v. Kmart Corp.,* 79 F.3d 1086, 1096 (11th Cir. 1996) (citing *Sperling v. Hoffman-LaRoche,* 118 F.R.D. 392, 407 (D.N.J. 1988), *aff'd in part and appeal dism'd in part,* 862 F.2d 439 (3d Cir. 1988)); *Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D. Tex. 1979). Plaintiffs bear the burden of showing they are similarly situated to the remainder of the proposed class. *Bayles v. American Med. Response of Colo., Inc.*, 950 F. Supp. 1053, 1062–63 (D. Colo. 1996).

The FLSA § 216(b) does not define the term "similarly situated." The prevailing standard recognized in the Fifth Circuit requires a two step inquiry. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Johnson v. TGF Precision Haircutters, Inc.*, 319 F. Supp. 2d 753, 754 (S.D. Tex. 2004). First, a court will make an initial determination of whether the plaintiffs are similarly situated at the "notice stage" in order to give notice of the action to potential class members. *Mooney,* 54 F.3d at 1213–14. This conditional class certification is largely based on the allegations set forth in pleadings and affidavits, and for this reason, is governed by a lenient standard requiring "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001) (quoting *Bayles,* 950 F.Supp. at 1066)). After discovery is complete and more factual information is available to the court, the court is often prompted to review class certification

in a motion to decertify. During this "decertification stage," and applying a stricter standard, the court will review several factors to determine if the plaintiffs are "similarly situated," including: (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* at 1103; *see also Morisky v. Public Srvc. Electric & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (noting for purposes of a misclassification claim, "similarly situated" must be "analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt"); *Mooney v. Arabian American Oil Co.*, 1993 WL 739661, *8 (S.D. Tex. 1993) (finding "due process concerns require the Court to scrutinize the opt-in plaintiffs and their respective claims with a more exacting eye to determine if they are in fact 'similarly situated'"). The Court will consider each factor in turn.

## I.     Disparate Factual and Employment Settings

This first factor assesses the opt-in plaintiffs' job duties, geographic location, supervision, and salary to determine if the Plaintiffs are similarly situated. *Johnson v. TGF Precision Haircutters, Inc.,* 2005 WL 1994286, *2 (S.D. Tex. 2005); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 358–59 (D.N.J. 1987). In this case, Plaintiffs do not rely on a company-wide job description, which contemplated ASMs performing the same job function. Instead, Plaintiffs rely on their actual day-to-day job duties to support their claims. Plaintiffs contend they are similarly situated because ASMs spent the majority of their time performing the same, "standardized" non-exempt tasks.[2] The Plaintiffs' deposition testimony, however, reveals significant differences in each ASM's job duties,

---

[2] Pls.' Resp. to Def.'s Mot. for Decertification, p. 8.

discretion, and authority, depending on the practices of individual store managers, store demographics, and location. *See Mike v. Safeco Ins. Co. of America*, 223 F.R.D. 50, 54 (D. Conn. 2004) (noting "class membership is not founded upon an [company] policy or other generalized proof, but rather on the fact-specific determination of each individual plaintiff's day to day tasks"). The fact that the Plaintiffs are or were at one time ASMs of EZPawn and may have spent the majority of their time performing non-exempt tasks does not establish sufficient similarities to warrant class certification. *See Smith v. Heartland Automotive Srvcs., Inc.,* 404 F. Supp. 2d 1144, 1152 (D. Minn. 2005) (finding plaintiffs case for certification cannot rest solely on the fact that they spent the majority of their time performing non-exempt tasks).

The extent of an ASM's discretion and authority largely depended on the store manager in charge of that particular store. The management style of individual store managers often dictated the nature of the duties an ASM was required to perform. Plaintiffs rely on several specific duties that ASMs routinely performed to establish that they are similarly situated. The Court will review several of the job duties relied on by Plaintiffs to highlight the differences in the individual experiences of the ASMs. For instance, store managers had different practices in the overall management of their stores. Some would divide the store into sections, with all employees, including the ASM, having responsibility for a section.[3] Other store managers would leave lists for

---

[3] All deposition testimony mentioned hereafter is cited from the exhibits attached to Pls.' Resp. to D.'s Mot. for Decertification. Chasteen Dep., p. 36 (the manager would conduct monthly meetings for all employees to assign sections, address each employee's responsibilities and convey other loan and sales information); Davila Dep., p. 40:20 ("I have a certain section that I'm in charge of to complete, make sure it's done."); Walls Dep., p. 34:16 ("We had, like, sections. Everybody did, had their own section to do and to keep up.").

the ASM and employees to complete in his or her absence.[4]  Plaintiff Erasmo Reyes recognized after working under several different store managers that "every manager is different."[5]

More specifically, ASMs had varying degrees of authority with respect to their ability to override the computer-generated price on a sale or loan amount.  Some ASMs exercised this authority up to $5 or $10, while others either had no approval code or were told that all overrides required store manager approval.[6]  Plaintiff Betty Cox's experience underscores the differences in an ASMs' override authority depending on which store manager was in charge.  Her first manager would "honor" Cox's decision to sell merchandise at a discount, or Cox would simply show her the item if the manager was there for approval; however, Cox's later manager set a strict $5 limit on any discounts given without his approval.[7]

---

[4]  Reyes Dep., p. 65:9 ("[T]he last couple of managers I had would write lists of things for me to accomplish.").

[5]  *Id.*; Walls Dep., p. 36:23 (in response to whether she ever told the SLRs to do their work, she stated "[the manager] ran the guys and I ran the girls"); Cooper Dep., p. 28:17 (manager would monitor the store on his days off by "call[ing] every hour on the hour").

[6]  Chasteen Dep., p. 50 (could use ASM passcode to override up to $10, then computer prompted for a manager's passcode for amounts above $10); Cox Dep., p. 65 (never had an approval code); Granger Dep., p. 54 (approval code for overrides of $5 or less); Johnson Dep., p. 82:11 (acting as store manager, she stated "I want to know what's being sold in my store and he–he does not have any type of window; so her ASMs could not sell anything outside of the computer-generated price without manager approval); Nunez Dep., p. 63:3 (he never used his override code without management approval, even on small amounts, because "[he] didn't want to get in trouble by anybody"); Randle Dep., p. 53:12 (as ASM, she didn't have to override an amount in the computer, but SLRs would come get her approval "out of respect" if they wanted to pay more on a loan); Walls Dep., p. 68:14 ("If it was over that ten amount, you know, I would go get [the manager].").

[7]  Cox Dep., pp. 61:12–62:10 (Q–"Was the $5 discount amount the same under all three store managers that you worked under?"  A–"No.  That was actually under the first one.  Now, with Sandra Renner, the lady manager, she usually–she usually would tell me, you know, 'Oh, why don't you let so-and-so have that for so-and-so.'  You know, which I would do that. . . I never really had to go and ask her, 'Can I discount this' or 'How much can I discount this?'  I

6

Also, although EZPawn had very little formal training for its employees, certain ASMs took a more active role than others in training new employees.[8] An additional distinction appeared at the stores in the Dallas area. Unlike other areas, in Dallas, all employees were trained at a central store before being sent to their permanent locations.[9] Certain managers also allowed ASMs to complete company paperwork, while others did not.[10] Further, a few ASMs were responsible for making the work schedule each week, depending on their individual store manager's practice.[11] One particular Plaintiff's testimony demonstrates the differences in how managers approached scheduling.

---

never–she never put me in that position to where I had to.").

[8] Agnew Dep., p. 51 (never involved in training SLRs); Cooper Dep., p. 30 (same); Chasteen Dep., p. 38 (all training done by manager); Davila Dep., p. 63 (training consisted of the employees watching her do her job); Granger Dep., p. 46 (no formal training, but he would answer the questions of new employees); Cardona Dep., p. 38:3 ("I would teach [the SLRs] how to do the–how to merchandise some items. I would teach them how to also do some of the jewelry. . ."); Nunez Dep., p. 45 (manager did all of the training, although she did train employees when the manager was out); Reyes Dep., pp. 86:23 & 111–112 ("The only training that I did was show them how to sell," otherwise all training was done by the manager).

[9] King Dep., p. 68:9–23 (for Dallas locations, employees would be trained at the larger "store on Buckner" before "send[ing] them out to the other stores"); Walls Dep., p. 26:11 ("I did work at Woody's Store, you know, the two weeks in the training" before going to her assigned store).

[10] Fernandez Dep., p. 62 (manager showed her how to do all the reports and she would complete the paperwork when the manager was absent); Granger Dep., p. 32 (citing his responsibility to run all the closing paperwork); Reyes Dep., p. 88 (same); Griffin Dep., p. 38:11 (Q–"Was there any paperwork associated with being an assistant store manager?" A–"I didn't get to do it."); Logue Dep., p. 43:24 ("[Managers] usually are the ones who took care of all the reports and all the paperwork.").

[11] Agnew Dep., p. 53 (never made the schedule); Granger Dep., pp. 57–58 (same); Randle Dep., p. 42 (same); Cardona Dep., p. 41:18 (I [created schedules] a couple of times to learn and I also did a couple of times when [the manager] wasn't there"); Davila Dep., p. 50:1 ("I write the schedules. I've written it like twice. And by write, I mean, [the manager] tells me what to put and I write it."); Fernandez Dep., p. 64 (she did the schedule a few times, but the manager would have to approve it); Reyes Dep., p. 128 (same).

Mischka Cooper, as an ASM, was never permitted to do scheduling; however, since being promoted to store manager she allows her ASM to do the schedules.[12]

Each store had different policies about which employees could make the daily bank deposits.[13] Also, ASMs were given different roles in the interviewing and hiring process. Some took absolutely no role in hiring, while others interviewed prospective employees and made recommendations on hiring.[14] Likewise, ASMs also exercised varying degrees of authority with respect to customer complaints, ranging from no involvement at all to handling all the customer complaints.[15] Finally, ASMs may have had extra paperwork and responsibilities depending on whether their store had an in-store Payday loan operation or whether their store carried guns.[16]

---

[12] Cooper Dep., p. 32:17 ("I asked [my ASM] for as much help as she could possibly give me, and that included help making their schedules.").

[13] Johnson Dep., p. 60 (as ASM, she sent SLRs to the bank); King Dep., p. 43 (only manager and ASM could make bank deposits); Randle Dep., p. 41 (as ASM, she made all the bank deposits); Walls Dep., p. 38 (same); Agnew Dep., p. 40 (manager made all bank deposits); Cardona Dep., p. 44 (same); Chasteen Dep., p. 44 (all employees took turns making bank deposits).

[14] Cardona Dep., p. 68 (no role in hiring or interviewing); Chasteen Dep., p. 51 (same); King Dep., p. 46 (same); Cox Dep., p. 54 (hired an employee when manager was out sick, with area manager's approval); Davila Dep., p. 48–49 (interviewed an employee based on a questionnaire she filled out and gave her opinion of the applicant to the manager); Randle Dep., p. 57 (interviewed around 7 applicants); Reyes Dep., pp. 124–25 (made recommendations about applicants and sat in on interviews).

[15] Agnew Dep., p. 50 (manager handled all customer complaints); Johnson Dep., pp. 83–84 (as ASM, she would refer all customer complaints to the manager); Davila Dep., p. 59 (handled no customer complaints); Chasteen Dep., p. 37 (senior SLRs handled only customer complaint he could remember); Fernandez Dep., p. 69 (as ASM, she implemented routine procedures for handling customer complaints); Granger Dep., p. 45 (resolved customer complaints when manager was absent); Reyes Dep., p. 109 (same).

[16] Agnew Dep., pp. 83–84 (the ASM had to account for the money and loans made by the onsite Payday loan operation); Chasteen Dep., p. 56 (every employee did Payday loans); Cox Dep., p. 108 (as ASM, her and one or two other employees did the Payday loans; she tried to

Plaintiff, Ingrid Randle's testimony highlights the various requirements that were involved with managing the Payday loan operation because she worked at two different stores in Houston. At the Airline store, she handled the Payday loans. She stated: "I organized it. I did the paperwork for them. I did the collections part for them. On Fridays is when mainly people get loans and pay on loans,"[17] whereas at the Sheperd location "Payday loans were low."[18] Additionally, the particular stores that carried guns required employees to complete additional paperwork and verify from the ATF that the buyer was authorized to purchase a gun.[19]

The deposition testimony also reveals that individual ASMs had differing views of their own supervisory role in their store. Some ASMs believed they were the manager in charge when the store manager was absent, while others believed they had no supervisory authority, even in the store manager's absence.[20] ASMs oversight of other employees also varied depending on the degree of

---

show other employees but they never picked up on it); Davila Dep., p. 61 (before audits she would have to make sure the payday loans were in order); Fernandez Dep., p. 59 (reviewed the paperwork associated with the Payday loans that SLRs made); Griffin Dep., p. 38 (required to give her passcode for the Payday loans); Johnson Dep., p. 65 (separated the Payday store from the main store during her employment); Nunez Dep., p. 31 (went to different store temporarily to train employees on how to do Payday loans).

[17] Randle Dep., p. 64:9–12.

[18] *Id.* at 64:17.

[19] Agnew Dep., p. 56 (recounting the various requirements); Randle Dep., p. 63 (same); Chasteen Dep., p. 46 (no guns sold in store); Fernandez Dep., p. 76 (same); Gonzalez Dep., pp. 61:20–62:8 (explaining the extra requirements because his store sold rifles and shotguns, including a meeting for managers and ASMs that provided "training in rifles and shtoguns as far as in how to handle them and what to do in a situation of when a customer brought a shotgun or a rifle into the store" and training on how to receive the most up-to-date information on their customers).

[20] Davila Dep., p. 60 (ensures tasks are done when manager is out); Fernandez Dep., p. 35 (store manager was off 3 days a week, and ASM was in charge during those times); Granger Dep., p. 43 (took on supervisor responsibilities when manager was out); Randle Dep., p. 50

involvement by their store manager and their own willingness to manage employees. One ASM, for example, took the initiative to encourage employees to reach their sales goals and would allow an employee to leave in an emergency when the manager was absent, while another felt she had no supervision responsibilities whatsoever.[21] Some ASMs would advise their managers if employees were violating company policy, some would take it upon themselves to point out the violations to the employee, and others would take a completely hands-off approach in disciplining employees.[22] Thus, the evidence presented shows a wide array of differences in the ASMs' individual experiences depending on the management practices of individual store managers and their own perceptions of their role in the company.

Geography also contributed to the disparate employment experiences of the ASMs. Although this lawsuit covers only the EZPawn locations in Texas, the testimony reveals that the geographic location of a particular store had a direct impact on the number of employees, annual sales, individual workload, inventory, and the importance of specific job duties. *See Johnson*, 2005

---

(same); Griffin Dep., pp. 39–40 (did not feel she was in charge when manager was absent because she had to get his approval on everything); Logue Dep., p. 53 (considered the area manager in charge when the manager was absent); Walls Dep., p. 32 (the store ran itself, so when the manager was absent she was not the person in charge).

[21] *Cf.* Reyes Dep., pp. 98–100 (offered SLRs advice on how to establish a clientele, prepared goal sheets for the employees and devised contests to encourage employees to meet their sales goals); Gonzalez Dep., p. 75 (everyone had an assigned section and as ASM, it was his responsibility to make sure the assigned area was being maintained) *with* Johnson Dep., p. 82 (ASMs have no responsibility for supervising the employees).

[22] Agnew Dep., p. 66 (noted employee violations of company policy and shortages and provided information to manager); Fernandez Dep., p. 65 (informed manager of employee violations of policy); *Id.* at 81–82 (consulted employee handbook to advise employee about dress policy); Reyes Dep., p. 126 (same); *Id.* at 132 (signed as witness on write-ups); King Dep., p. 41 (manager does all write-ups); Chasteen Dep., p. 51 (no involvement in discipline); Cooper Dep., p. 42 (same); Nunez Dep., p. 66 (same).

WL 1994286, *6 ("Variances even within a single state, however, are not necessarily insignificant."). In fact, even stores in the same city would operate differently.[23] For example, in response to whether EZPawn had central policy guidelines, Plaintiff Maria Fernandez stated "every store runs their store in a different way."[24] The location of a store often dictated the volume of business and the number of employees, thereby affecting an ASM's workload and responsibility. For instance, a store in a large metropolitan area such as Dallas would have 7 employees, while a store in Abilene might only have 4 employees.[25] Plaintiff Georgette Johnson explained that when she worked at the larger Dallas location as ASM, there were three or four SLRs, an ASM, and a store manager, whereas when she was promoted to store manager she was transferred to a smaller store and there were only two SLRs and an ASM.[26] The evidence here indicates there were substantial differences in the working conditions of ASMs at different locations around Texas.

Plaintiffs attempt to gloss over the many differences in the factual and employment settings at each store and convince the Court that ASMs are similarly situated because they performed the same tasks. However, the evidence clearly establishes that ASMs' job duties varied from store to

---

[23] Johnson Dep., pp. 36–37 & 48–49 (explaining the amount of loans the store makes annually "dictates" the size of the store and the number of employees at each location); Randle Dep., p. 45:8–12 (Q–"And does [closing the store] also require two people at least?" A–"All depends on the area that you're in and how busy your store is. It may be a manager and two people for more safety precautions."); Reyes Dep., p. 74:10–13 (explaining price variations depending on location, stating "[t]he district manager would come in and say, 'I want that at that price.' And we always tried to say that we're in a small town. We're not in San Antonio or Houston. It's different here.").

[24] Fernandez Dep., p. 68:14.

[25] *Cf.* Chasteen Dep., p. 31 (Dallas); Walls Dep., p. 28 (Dallas) *with* Agnew Dep., p. 35 (Abilene).

[26] Johnson Dep., pp. 34:3–37:6.

store depending on the management style of their superiors and store demographics. *Lusardi v. Xerox Corp.*, 122 F.R.D. 463 (D.N.J. 1988) ("The opt-in plaintiffs performed different jobs at different geographic locations and were subject to different job actions . . . as a result of various decisions by different supervisors made on a decentralized employee by employee basis."). Although the ASMs held the same job title, this fact alone does not necessarily mean they performed the same work. *Morisky v. Public Srvc. Electric & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("Even employees who hold the same job title do not necessarily perform the same work."). Therefore, other than the global allegations of Plaintiffs that the FLSA was violated, that they were all ASMs for EZPawn at some point, and that they primarily performed non-exempt work, there is no real commonality among the Plaintiffs in their actual day to day job duties.

**II.    Defenses**

The second factor raises the issue of whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff. *Moss v. Crawford & Co.,* 201 F.R.D. 398, 409 (W.D. Penn. 2000). Because individualized defenses prevent an efficient proceeding with a representative class, several courts have granted motions for decertification on this basis. *Id.* at 410. However, the district court has the discretion to determine whether the potential defenses would make the class unmanageable. *Id.*

EZPawn maintains that ASMs were properly classified as exempt employees and intends to assert the various exemptions provided under the FLSA to defend against Plaintiffs' claims. *See* 29 U.S.C. § 213(a)(1) (exempting "bona fide executive, administrative, or professional" employees from the FLSA's overtime pay requirements).  Defendant plans to assert the executive, administrative, or a combination of both exemptions depending on the individual circumstances of

each ASM's case. The exempt or non-exempt status of any particular employee must be determined on the basis of whether his duties, responsibilities, and salary meet all the requirements of the appropriate exemption criteria. 29 C.F.R. § 542.201(b)(2). Although the Court does not express an opinion as to the merits of the Plaintiffs' misclassification claims, the relevant statutory exemption criteria will require an individual, fact-specific analysis of each ASM's job responsibilities. *Morisky*, 111 F. Supp. 2d at 499 (determining whether an employee's duty is executive or administrative is extremely individual and fact-intensive, requiring "a detailed analysis of the time spent performing administrative [or executive] duties" and "a careful factual analysis of the full range of the employee's job duties and responsibilities" (quoting *Cooke v. General Dynamics Corp.*, 993 F. Supp. 56, 59 (D. Conn. 1997)). As discussed at lengths above, the degree of discretion and authority each ASM exercised varied depending on store management and store demographics, making this case particularly unsuitable for collective treatment when applying exemption analysis.

Further, while some Plaintiffs may fall squarely within an exemption based on their deposition testimony, EZPawn may have to use employment records and/or other contradictory witness testimony to rebut some of the Plaintiffs' allegations that they had absolutely no management duties. Defendant further intends on presenting unsatisfactory performance reviews for certain Plaintiffs to demonstrate that those Plaintiffs had exempt duties but either failed or refused to exercise those duties, thereby "convert[ing] an exempt job into a non-exempt one."[27] For those Plaintiffs who claim they were denied the opportunity to perform exempt tasks by their

---

[27] D.'s Mot. for Decertification, p. 15 (quoting *Stein v. J.C. Penney Co.*, 557 F. Supp. 398, 405 (W.D. Tenn. 1983)).

managers, EZPawn also intends to use evidence that those ASMs did not utilize the internal complaint procedure. These defenses require individualized evidence, making it difficult for EZPawn to defend all of Plaintiffs' claims with generalized proof.

Another factor weighing against certification is the regulation change in August, 2004 by the Department of Labor, amending the requirements for the executive and administrative exemptions. Because the class members consist of ASMs employed by EZPawn between December 1, 2002 to the present, the amended regulations will affect the defenses applicable to each ASM depending on when each ASM was employed by EZPawn. Thus, the various individualized defenses and the different regulatory treatment required for each Plaintiff weighs against certification.

### III.    Fairness and Procedural Considerations

Finally, fairness and procedural considerations direct the court to consider the primary objectives of the FLSA § 216(b) collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity. *See Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (noting a collective action affords plaintiffs the "advantage of lower individual costs to vindicate rights by the pooling of resources" and "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact"). The court must also consider whether it can coherently manage the class in a manner that will not prejudice any party or be particularly burdensome on a jury. *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (finding a collective action "impose[d] extraordinary burdens on the jury, both in terms of quantity of evidence and the length of trial").

Plaintiffs contend certification of the class will further judicial economy by preventing over

forty individual actions being filed all over Texas and will allow pooling of resources to help the Plaintiffs, as a class, vindicate relatively small claims. This benefit, however, must be weighed with all the other factors. In light of the individual analysis each Plaintiff's claim will require, the judicial inefficiency of having essentially forty plus mini-trials clearly outweighs any potential benefits in proceeding as a collective action. The Plaintiffs' claims are not amenable to generalized evidence and the Court would not be able to "coherently manage" the class without potentially prejudicing the parties. *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Penn. 2000). Our sister court in the Southern District of Texas noted in decertifying a class:

> Plaintiffs' disparate and various claims do not present common issues of law and fact arising from the same alleged activity but depend upon varied and sundry activities of individual [] managers of different shops in about [20] different locations in [] Texas. [T]he individualized claims and individualized defenses, all of which are highly fact intensive, would not only dominate but would swallow and consume the entire case.

*Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, *7 (S.D. Tex. 2005). This succinctly summarizes the same reasons this Court believes that this particular action is unsuitable for collective treatment. As a consolation, Plaintiffs will have the benefit of the extensive discovery already completed in this case in pursuing their individual claims. *Smith v. Heartland Automotive Srvcs., Inc.,* 404 F. Supp. 2d 1144, 1155 (D. Minn. 2005). Thus, due to the numerous factual differences in each Plaintiff's case, requiring a highly fact specific inquiry, the Court is of the opinion that fairness and procedural considerations weigh against certifying this class.

Finally, Plaintiffs also argue that EZPawn should be estopped from claiming ASMs are dissimilar because it already affirmatively represented to the Court that the class members were the same when arguing its summary judgment motion. The Court is not convinced that EZPawn made any such admission in its motion for summary judgment. Although EZPawn sought summary

judgment as to the class as a whole, the Court does not consider this an admission that the Plaintiffs are similarly situated for purposes of class certification. At the time Defendant filed its motion for summary judgment, the procedural posture of the case made it necessary for the Defendant to address the class claims as a whole because the case was in the "notice stage" and the class had been conditionally certified. Further, regardless of the claims in Defendant's motion for summary judgment, it is the Plaintiffs' burden to show they are similarly situated for class certification. Thus, the Court finds this argument to be without merit.

## Conclusion

For these reasons, the Court declines to certify the class and grants Defendant's Motion for Decertification (Dkt. #161). All claims filed herein by opt-in Plaintiffs are dismissed without prejudice. To avoid prejudice to individual opt-in Plaintiffs who may choose to file their own cases, the Court invokes its equity powers to toll the applicable statute of limitations for 30 days after the entry of this Order. The claims of Plaintiff Erasmo Reyes remain pending herein for trial.

It is so ORDERED.

Signed this 8th day of January, 2007.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE